Filed 11/6/14  In re Jacob S. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| In re JACOB S., a Person Coming Under the Juvenile Court Law. | C076530 |
| EL DORADO COUNTY DEPARTMENT OF HUMAN SERVICES, | (Super. Ct. No. SDP20130037) |
| Plaintiff and Respondent, | |
| v. | |
| SCOTT S., | |
| Defendant and Appellant. | |

Scott S. (father) appeals from the juvenile court's order terminating his parental

rights as to minor Jacob S.  (Welf. & Inst. Code,**1** § 366.26.)  He contends the court's

finding that the beneficial parental relationship exception to adoption did not apply is not

---

**1**       Undesignated statutory references are to the Welfare and Institutions Code.

1

supported by substantial evidence because: (1) the court misapplied the law; and (2) the strong bond between himself and the minor justified finding the exception applicable. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2013, El Dorado County Department of Human Services (the department) filed a petition alleging the four-year-old minor came within section 300, subdivisions (b) and (g) because father was in custody at the El Dorado County Jail for violating a domestic violence restraining order; the whereabouts of mother (D. T.) were unknown; father had removed the minor from mother's care in July 2013 because she was allegedly abusing methamphetamine and selling drugs; and the minor had previously been a dependent in Placer County Superior Court due to sustained allegations of domestic violence and substance abuse as to both parents.[2]

An amended section 300 petition deleted the allegation that father was in custody and added the allegation that both parents continued to struggle with substance abuse.

The jurisdiction report stated: Father had prior dependency cases with three older minors; his parents became their guardians. He had multiple misdemeanor convictions.

The minor tested positive for methamphetamine and amphetamine on September 10, 2013, when he had allegedly been in father's custody for at least 10 weeks. Father blamed this result on a babysitter. A hair follicle test of the minor on September 19, 2013, after he was detained, was negative for all substances.

Father claimed he had a lifelong drug addiction, but had recently gotten clean during a visit to Florida. He did not want to test for drugs now unless the babysitter also tested.

---

[2] Mother is not a party to this appeal.

2

At the contested jurisdiction hearing, the juvenile court found the allegations of the amended section 300 petition true. The court found by clear and convincing evidence that the minor's drug testing showed repeated exposure to methamphetamine, probably within the last 60 days, when he was in father's custody. The court ordered father to submit to drug testing. The court also found, however, that father had knowledge of how to parent the minor, and directed the department to prepare a parenting plan for him.

The disposition report recommended denying reunification services to the parents under section 361.5, subdivision (b)(13) (intractable substance abuse). Although father testified at the contested jurisdiction hearing that he had not used any substances other than marijuana and alcohol for almost two years, he admitted after the hearing that he had used methamphetamine with mother for at least a week in July 2013 when the minor was in their care. The parents had continued to abuse substances despite completing court-ordered substance abuse services.

Father had an extensive history of domestic violence, not only with mother but also with other women. He had failed to reunify with his three older children after they were removed from his care. His participation in services to date was minimal.

Father had completed an alcohol and other drugs assessment, had just attended his first outpatient group, and had recently begun random drug testing. However, he had not done other services he had been offered and referred to, including inpatient and outpatient substance abuse treatment, 12-step meetings, and a mental health evaluation. During the alcohol and other drugs assessment, father admitted he would continue to use marijuana and alcohol until the juvenile court ordered him to stop. Two recent drug tests, the second one dated November 7, 2013, were positive for amphetamines and methamphetamine.

3

The minor was adjusting well in foster care and day care. He was developmentally on target. His placement was able to meet his needs.

Father visited the minor three times a week and conducted himself appropriately.

An addendum report filed in December 2013 stated that father's urine testing was positive for marijuana metabolite throughout November, and on November 25 also for opiates. His latest hair follicle test was positive for methamphetamine and the levels of amphetamine had increased. He ascribed his positive amphetamine results to Wellbutrin, an antidepressant for which he did not have a prescription. He ascribed his positive opiate results to eating poppy seed bagels or muffins. He did not want to go into an inpatient program because he feared losing his job and apartment. So far he had been unable to maintain sobriety as an outpatient or to be honest about his drug use.

At the contested disposition hearing, the juvenile court denied reunification services to both parents, reduced father's visitation to once a week, and set a section 366.26 hearing. The court stated that it had intended to order reunification services for father at the outset, but father's "horrific" and "laughable" testimony convinced the court not to do so. Nothing father said to explain away his drug use and his positive tests was credible. According to expert testimony, the minor's positive drug tests showed levels of exposure to methamphetamine "over ten times that of a casual drug user," and father's drug tests showed he had continued to use in front of the minor "at least during July and probably longer." Father blamed everyone else in the case for his own failures. Father was not ready to engage in services in the way he would need to do to be able to parent the minor. It was in the minor's best interest "to be taken away from this alternative universe that he was born into and be mainstreamed."

The section 366.26 report recommended termination of parental rights and adoption for the minor.

The minor remained on target developmentally, though needing speech therapy and dental work. He had had great trouble transitioning to and from visits with father,

4

but this was diminishing as he learned to trust his foster parents and others. Because his current caregiver felt unable to adopt, he had been matched to a prospective adoptive family and was being slowly transitioned into their home. His speech and his comfort with other children were improving, though he still had difficulty controlling his emotions. A mental health evaluation had found no need to open a case for him at this time. He was a sweet, good-natured, and resilient child. Given his troubled history with his biological parents, he needed a safe, stable, and secure environment, which adoption would provide.

Father had been convicted in March 2014 of a misdemeanor for violating a court order and was on 36 months' probation, which included the requirement to complete a batterers' program.

Father's visitation had been reduced to one two-hour supervised visit per week. He was tardy for many visits, which affected the minor's emotions. As of April 16, 2014, he had not visited the minor for over two months, his last visit occurring on February 13, 2014. He did not call or show up for the visit scheduled for February 20 and had not contacted anyone regarding later visits. However, his interactions with the minor during visits were positive; he had demonstrated that he could attend to the minor's emotional needs, use redirection when necessary, and actively engage in play with the minor.

Father had entered a Salvation Army rehabilitation program, but had said he would leave if he did not get the minor back. It appeared that he was doing the program only to try to reunify with the minor, not because he genuinely wanted to become sober.

An addendum report stated that the minor had recently relocated to the prospective adoptive home; he was happy there and steadily establishing a positive attachment to the family. Father, who at age 46 had a 30-year history of addiction, still did not acknowledge that his addiction had caused much of his past and current criminal behavior. However, an attached letter from a Salvation Army intake supervisor indicated

5

that father had been in a rehabilitation center for two months, was doing well in the program, and seemed motivated to change his life.

At the contested section 366.26 hearing on May 9, 2014, father testified as follows:

He did not want the minor to be adopted.

He visited with the minor "[l]ast Friday," and prior to that two weeks before. He had had regular visitation except during his 45-day blackout period at the Salvation Army, and had resumed it as soon as possible after that. Before he went into the program, he had been visiting with the minor three times a week. He had missed only two visits, once because he had to work out of state and once because of a court date.

Last Friday's visit was "awesome." There was "a closeness between" father and the minor. They sat together, watched a movie, and cuddled. They talked about school, and father tried to comfort the minor because he said he had no friends. It appeared to father that the minor was comforted by father's advice. Father knew some topics were not allowed, and he avoided them.

At the previous visit, the minor had been very nervous because it was in new surroundings. But at the latest visit, that fear was gone; father and the minor hugged and kissed as usual, and the minor sought out father's affection.

In father's opinion, he and the minor had a bond that was very playful, but went beyond that. The minor habitually cuddled with him, reached out and hugged him, and said he loved him.

Father acknowledged that the minor could develop a similar bond with someone else over a period of time, and that it would not be bad for the minor to do so if father or mother could not provide for him. However, father was willing to "correct [his] problem with [his] situation" and had started the process of doing so. His love for the minor far outweighed anything he had ever gained from substance abuse or other bad behavior.

6

Although father wanted to reunite with the minor as soon as possible, he knew it could not happen for at least three months, until he completed his Salvation Army inpatient program. Once he had gone into the outpatient phase, he could take the minor into his home.

Father's sober date, by his own reckoning, was November 1, 2013. He believed he last ingested drugs in September, but could not recall the exact date. He attended five to eight AA meetings a week. He also attended weekly therapy, parenting classes, relationship classes, relapse management, anger management, and spiritual counseling. He worked the 12 steps through the Salvation Army program; he was currently working on step seven.

Father admitted that when the social worker told him the department recommended adoption, he replied: "Then what am I doing here [i.e., the Salvation Army]?" He said that in anger because he felt that the social worker's remarks denied him any hope. He was not actually planning on walking out; he had simply "chose[n] his words unwisely" under stress.

Father also conceded that the minor was adoptable and it would be in his best interest to have the kind of secure, stable home life adoption provides.

Father admitted he drank and smoked marijuana while the minor was in his custody, although he did not do so at home. He still denied using methamphetamine at that time. However, he admitted that he used methamphetamine in August or September 2013.

After hearing argument, the juvenile court ruled:

By clear and convincing evidence, the minor was adoptable, and the prospective adoptive family wanted to adopt him. It would be detrimental to return him to either parent at this time.

Although father had "a real bond" with the minor and had consistently visited with him, the bond was not "so significant that severing it would be more detrimental to [the

7

minor] than providing him the permanence of adoption." The minor had been out of father's custody for over half of his life, "which would explain his abandonment issues . . . pretty significantly." It would be difficult for the minor to have his bond with father severed, but the minor would be able to form bonds with an adoptive family, and ultimately that would be in the minor's best interest because it would give him stability and consistency in his life.

Father's current efforts to attain sobriety were impressive. But the law was clear that the minor need not wait for father to complete the process, and could not afford to do so. When the minor had found stability and consistency in foster care, he "d[id] better." Remaining in suspense about whether father would resolve his problems and putting off permanency in the meantime would not be in the minor's best interest.

For all these reasons, the juvenile court found "by clear and convincing evidence" that the beneficial parental exception had not been shown. The court therefore ordered the termination of parental rights and a permanent plan of adoption.

## DISCUSSION

Father contends the juvenile court erred by rejecting his claim that the beneficial parental relationship exception to adoption applied. We disagree.

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

There are only limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One of these is the beneficial parental relationship exception, which exists where the parent has maintained regular visitation and contact

8

with the child and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).) The "benefit" to the child must promote " 'the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*In re C.F.* (2011) 193 Cal.App.4th 549, 555, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Even frequent and loving contact is not sufficient to establish this benefit absent a significant, positive emotional attachment between parent and child. (*C.F.*, at p. 555; *Autumn H.*, at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The party claiming an exception to termination of parental rights has the burden of establishing the existence of the circumstances alleged to constitute the exception. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing the evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the

9

sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge.' " (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

The juvenile court found that a bond existed between father and the minor, but that it was not strong enough to outweigh the benefit to the minor from adoption. Substantial evidence supports that finding, which was well within the court's discretion.

The minor, still very young, had been out of father's custody for more than half of his life and had developed "abandonment issues," largely due to that separation. He urgently needed the stability and permanence that come from adoption. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467 [age of child, portion of child's life spent in parent's custody, and child's particular needs among factors to consider, as well as positive or negative effect of child's interaction with parent, in determining whether relationship important and beneficial].)

The minor was already happily placed with his prospective adoptive family and was rapidly bonding with them. Father conceded that the minor could readily do so and that it would be better for him to bond with adoptive parents if his biological parents could not care for him. When an adoptable minor is placed with adoptive parents, is forming bonds with them, and looks to them to meet his needs, the courts will not find detriment to the minor from the termination of parental rights. (Cf. *In re Dakota H.* (2005) 132 Cal.App.4th 212, 231.)

Furthermore, father is a 30-year drug addict who had been drug free, by his own account, for only seven months at the time of the section 366.26 hearing, had maintained sobriety so far only in the restrictive conditions of an inpatient facility, and would have to remain there for at least three more months before he could be released to outpatient treatment -- on which he had consistently failed before. Thus, the juvenile court, though impressed by father's recent efforts, could not discount the possibility that he might relapse or that the outcome might remain uncertain for a long time to come. These factors outweighed the fact that father had maintained a positive relationship with the

10

minor during supervised visitation. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425.)

Father asserts that the juvenile court misapplied the law in two respects. We conclude any misstatement by the court was harmless error.

According to father, the court erroneously based its ruling on the fact that the minor would not be able to return to father's custody at the conclusion of the hearing, which is irrelevant at the selection and implementation stage. Father misconstrues the court's remarks.[3]

After noting that it would be detrimental to return the minor to either parent at this time, the juvenile court went on to say (as quoted by father in his reply brief): "[T]he law is really clear that [the minor] doesn't have to wait. He shouldn't have to wait to figure out whether or not you're going to be successful or not . . . he can't afford to wait for you." In context, it is clear that the court was simply and correctly observing that once a case has reached the stage of a section 366.26 hearing, the minor's need to obtain stability and permanence through adoption as quickly as possible outweighs any competing interest. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 308-309 [interplay of §§ 366.26 & 388].) And, as mentioned already, the court was also pointing out that the minor's need for stability and permanence could not be put on hold while waiting for father to prove he can become a drug-free, responsible adult. (*In re Cliffton B.*, *supra*, 81 Cal.App.4th at pp. 424-425.) The court's remarks were not erroneous.

According to father, the juvenile court further misapplied the law in finding he had not proved the applicability of the beneficial parental relationship exception by "clear and convincing evidence." We agree with father that the standard he was required to meet

---

[3]     Father's opening brief fails to make his argument clear, because he merely cites to pages of the reporter's transcript without quoting or paraphrasing the remarks by the court that he finds objectionable. However, in his reply brief, he quotes those remarks.

11

was merely "a preponderance of the evidence." (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295; see *In re K.P.*, *supra*, 203 Cal.App.4th at p. 622; *In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) But because father did not object to the court's misstatement of the standard, the claim of error is forfeited. (*In re Christopher B.* (1996) 43 Cal.App.4th 551, 558; see *In re S.B.* (2004) 32 Cal.4th 1287, 1293.) In any event, it lacks merit.

We review the trial court's result, not its reasoning. (*California Aviation, Inc. v. Leeds* (1991) 233 Cal.App.3d 724, 731.) Here, despite the court's verbal slip, its reasoning taken as a whole supports the finding that father failed to establish the applicability of the beneficial parental relationship exception to adoption by even a preponderance of the evidence. The only evidence he offered on this point at the section 366.26 hearing was his own subjective impression of how he and the minor got along at their infrequent supervised visits.[4] The court could reasonably find that evidence insufficient to meet father's burden of showing that the benefit of maintaining his relationship with the minor outweighed the benefit of adoption.

Lastly, father asserts that he met the required standard to prove the applicability of the exception. However, his argument depends on improperly construing the evidence most favorably to himself. We conclude father has shown no error in the juvenile court's contrary finding.

---

[4] Father's citation to evidence presented at earlier hearings where the termination of parental rights was not at issue is unavailing, as is his discussion of the general findings of "experts on attachment theory."

12

DISPOSITION

The order terminating parental rights is affirmed.


      ROBIE      , Acting P. J.


We concur:


      DUARTE      , J.


      HOCH      , J.